UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| MELISSA LATTIMORE, <br><br> Plaintiff, <br><br> v. <br><br> LP BREMEN MANAGEMENT LLC, <br><br> Defendant. | CAUSE NO. 3:23cv1048 DRL |

OPINION AND ORDER

Signature HealthCARE Bremen hired Melissa Lattimore to work as a qualified medication aide (QMA) and certified nursing assistant (CNA). After resigning, she brought this lawsuit alleging that she was discriminated against because of her race under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and 42 U.S.C. § 1981. Bremen requests summary judgment on both claims, and the court grants the motion.

BACKGROUND

In September 2022, Bremen hired Ms. Lattimore, a Black woman, as a QMA and CNA at a nursing home [44-1, 44-2, 44-3 Tr. 17, 33-34]. As both, Ms. Lattimore reported to charge nurses and the director of nursing [44-2 at 1]. Early in her employment, Ms. Lattimore had a conflict with a supervising nurse, Staci,[1] and reported Staci to supervisors for interrupting Ms. Lattimore's break [44-3 Tr. 89-91]. Ms. Lattimore complained that Staci was "micromanaging" her and making her uncomfortable [*id.* Tr. 110]. She never worked with Staci again [*id.* Tr. 92].

---

[1] Ms. Lattimore doesn't know Staci's last name [44-3 Tr. 46].

In October that year, Ms. Lattimore had an incident with a different nurse, Suzanne Cooper [*id.* Tr. 109]. Nurse Cooper, who is also Black, asked Ms. Lattimore to clean up a resident because his feeding tube had spilled [*id.* Tr. 44, 112-14]. Bathing patients was part of her job duties [44-2]. But Ms. Lattimore had recently cleaned this resident, and she believed Nurse Cooper spilled the feeding tube's contents, so she told Nurse Cooper to clean him [44-3 Tr. 114].

As an LPN, Nurse Cooper could instruct Ms. Lattimore during her shift, including telling Ms. Lattimore to clean patients as part of her job, and Ms. Lattimore eventually cleaned the patient [*id.* Tr. 115, 118]. She attended a coaching and counseling session related to the incident, where supervisors instructed her to talk to nurses respectfully and not to create a hostile environment [44-4; 44-3 Tr. 122-23]. Ms. Lattimore doubled down, writing during counseling that "[i]f a nurse makes a mess with a feeding tube please clean up the mess and not pretend you don't know what happened" [44-4].

Ms. Lattimore later testified that she believed Nurse Cooper intentionally made a mess so that she would have to clean the patient and that she had never seen Nurse Cooper do the same thing to white nurses, but Ms. Lattimore admits she didn't see how the mess happened [44-3 Tr. 123-24]. Nothing further came from this incident, and Ms. Lattimore never worked with Nurse Cooper again [*id.* Tr. 43].

On November 20, 2022, Ms. Lattimore complained to supervisors when coworkers wouldn't help her pass food trays to residents [44-5; 44-3 Tr. 50, 60]. She testified that the custom was for everyone to help pass trays to make sure the residents were eating, but no one helped her [44-3 Tr. 55-56]. She called the director of nursing, Patricia Moore, and complained about her colleagues from the nurse's station, where they could hear her [*id.* Tr. 56-57]. She testified that

2

she didn't know why the nurse on duty wasn't helping her but that she had "seen him help white people pass their trays" [*id.* Tr. 63-64]

On December 3, 2022, Ms. Lattimore had a verbal dispute with another employee, Cathie Cole, who called out of work because of Ms. Lattimore's mistreatment [44-7 ¶ 5-6]. Ms. Cole informed Director Moore that she didn't feel comfortable with Ms. Lattimore working under her license and wouldn't continue working with her [*id.* ¶ 5]. Ms. Lattimore told Director Moore that she thought other employees picked on her because she was Black; and, when asked why she felt that way, Ms. Lattimore responded that the other employees picked on her and gave her the hardest patients [*id.* ¶ 7].

Fatima Kroft, the unit manager who helped manage the facility's nursing staff, testified that several staff members requested not to work with Ms. Lattimore because of her conduct and behavior, and she noted that she spoke with Ms. Lattimore about focusing on her own work, rather than the work of others [44-9 ¶ 6]. Director Moore and Unit Manager Kroft met with Ms. Lattimore on December 20 for another coaching and counseling meeting "to discuss additional concerns voiced by staff and provide her a final written warning for continued concerns with her conduct and behavior" [*id.* ¶ 8]. Ms. Lattimore knew that she wasn't being terminated at the meeting [44-3 Tr. 149]. Ms. Lattimore claimed that the meeting occurred because she was Black, and when Unit Manager Kroft reminded her that Nurse Cooper was also Black, Ms. Lattimore said, "she is not black. I know what black is" [44-9 ¶ 9]. Director Moore attempted to continue with the coaching session, but Ms. Lattimore then stood up and quit in the meeting [*id.* ¶ 10]. Ms. Lattimore stormed down the hallway, cursed, put the keys on the medication cart, threatened to

3

hit one coworker, made a racial comment to another,[2] and threw soda as she left [*id.* ¶ 11-12; 44-3 Tr. 150, 152-54].

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in her favor. *Beardsall v. CVS Pharm., Inc.*, 953 F.3d 969, 972 (7th Cir. 2020). The court must construe all facts in the light most favorable to the non-moving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp./Nichols-Homeshield*, 200 F.3d 485, 491-92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor is the court "obliged to research and construct legal arguments for parties." *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

---

[2] Ms. Lattimore called Nurse Cooper an "Uncle Tom b****" [44-3 Tr. 152-53]. She said she didn't know it was a racist comment, but she clarified that "the reason why I call[ed] her that from…my understanding, Uncle Tom is a person that mistreats their own skin color people to impress the white people. So in my mind, that's what she was" [*id.* Tr. 153].

DISCUSSION

The court first addresses procedural issues that Bremen raises. Ms. Lattimore's response was due April 14, 2025. This deadline passed without a response. Pursuant to N.D. Ind. Local Rule 7-1(d)(5), the court may rule summarily if a party fails to timely respond to a motion. "Strict enforcement of [local rules] does not mean that a party's failure to submit a timely filing automatically results in summary judgment for the opposing party." *Wienco, Inc. v. Katahn Assocs., Inc.*, 965 F.2d 565, 568 (7th Cir. 1992). Rather, that failure "causes all factual assertions alleged by the opposing party to be deemed admitted." *Id.* Additionally, Ms. Lattimore's untimely response didn't comply with Local Rule 56-1, which requires a response to the movant's statement of material facts with particular cites to the record. N.D. Ind. L.R. 56-1(b). The court will excuse Ms. Lattimore's late response and consider her legal arguments, in part because Bremen has suffered no prejudice and ably replied to them; but, because she failed to comply with the local rules, the court deems all facts in Bremen's statement as admitted. *Wienco*, 965 F.2d at 568.

Ms. Lattimore brings two discrimination claims, one under Title VII and one under § 1981. These statutes provide independent avenues of relief for an aggrieved party, *Johnson v. Ry. Express Agency, Inc.*, 421 U.S. 454, 461 (1975), though they share a similar legal analysis, *Humphries v. CBOCS W., Inc.*, 474 F.3d 387, 403 (7th Cir. 2007). Title VII makes it "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race." 42 U.S.C. § 2000e-2(a)(1); *see also Ames v. Ohio Dep't of Youth Servs.*, 221 L. Ed. 2d 929, 934 (2025). Similarly, § 1981 prohibits racial discrimination in employment, but does not otherwise require a party to file a complaint with the EEOC before bringing suit. *See Johnson*, 421 U.S. at 459.

5

Under either statute, the plaintiff must "provide enough evidence to permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment action." *Oliver v. Joint Logistics Managers, Inc.*, 893 F.3d 408, 411-12 (7th Cir. 2018) (citing *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)) (quotation omitted); *see also Humphries*, 474 F.3d at 403; *Alexander v. Wis. Dep't of Health & Fam. Servs.*, 263 F.3d 673, 682 (7th Cir. 2001). Although the indirect method of proof can still be utilized, the law uses a holistic approach that poses a singular question at summary judgment: whether the evidence would permit a reasonable factfinder to conclude that Ms. Lattimore's race caused an adverse employment action. *See Ortiz*, 834 F.3d at 765.

General allegations that the defendant "knew about" the plaintiff's race or was "motivated by discrimination" aren't enough. *Mir v. State Farm Mut. Auto. Ins.*, 847 F. Appx. 347, 350 (7th Cir. 2021). For a § 1981 action, the plaintiff must "ultimately prove that, but for race, [she] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). Under Title VII, the plaintiff must "show that the motive to discriminate was one of the employer's motives, even if the employer also had other, lawful motives that were causative in the employer's decision." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343 (2013).

Bremen argues for summary judgment on both claims because Ms. Lattimore didn't suffer an adverse employment action; she voluntarily resigned. Adverse employment actions fall into three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such

6

as a hostile work environment or conditions amounting to constructive discharge." *Beverly v. Abbott Labs.*, 107 F.4th 737, 745 (7th Cir. 2024). Ms. Lattimore doesn't point to a specific adverse action like a termination or pay reduction, and "[u]nfair reprimands or negative performance reviews, unaccompanied by tangible job consequences," aren't materially adverse. *Boss v. Catros*, 816 F.3d 910, 919 (7th Cir. 2016). No reasonable jury could call this particular coaching and counseling session an adverse action either.

Instead, Ms. Lattimore claims she was constructively discharged. There are two forms of constructive discharge. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679 (7th Cir. 2010). Both require intolerable work environments. *Id.* In the first, the employee resigns due to alleged discriminatory harassment; in the second, the separation occurs because the employer has acted in a manner so as to have communicated to a reasonable employee that she will be terminated. *Id.* Ms. Lattimore hasn't alleged any facts suggesting that Bremen acted in a manner so as to have communicated a foreseeable termination—indeed, the record shows indisputably otherwise, *see, e.g., Scaife v. U.S. Dep't of Veteran Aff.*, 49 F.4th 1109, 1119 (7th Cir. 2022)—so she must have evidence for a reasonable jury to find that she resigned because discriminatory harassment created an intolerable work environment.

To establish constructive discharge, Ms. Lattimore must show "that the abusive working environment became so intolerable that her resignation qualified as a fitting response." *Pa. State Police v. Suders*, 542 U.S. 129, 134 (2004); *accord Fugate v. Dolgencorp, LLC*, 555 F. Appx. 600, 605 (7th Cir. 2014) (quoting *Bennington v. Caterpillar, Inc.*, 275 F.3d 654, 660 (7th Cir. 2001)) (plaintiff must offer evidence of conditions "so intolerable that a reasonable person would have been compelled to resign"). She must show "working conditions even more egregious than that

7

required for a hostile work environment claim." *Chapin*, 621 F.3d at 679. It isn't enough to show the conditions were merely unpleasant, unprofessional, or boorish. *Brooks v. Avancez*, 39 F.4th 424, 441 (7th Cir. 2022); *McPherson v. City of Waukegan*, 379 F.3d 430, 438 (7th Cir. 2004). Isolated incidents that aren't repeated aren't sufficient. *See Wince v. CBRE, Inc.*, 66 F.4th 1033, 1043 (7th Cir. 2023). Courts assess constructive discharge claims "from the viewpoint of a reasonable employee." *Beverly*, 107 F.4th at 745.

The conditions must be "pervasive and extreme." *Id.* (citing cases). A situation in which "there is a threat to a plaintiff's personal safety" would constitute a constructive discharge. *Chapin*, 621 F.3d at 679. For example, the "repeated use of a noose—perhaps the ultimate symbol of racial hatred and hate crimes—combined with implied threats of physical violence" was sufficiently egregious. *Porter v. Erie Foods, Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009). In another case, a plaintiff's immediate boss lectured him while "displaying a gun." *Taylor v. W. and S. Life Ins.*, 966 F.2d 1188, 1190 (7th Cir. 1992); *cf. Stamey v. Forest River, Inc.*, 37 F.4th 1220, 1225-26 (7th Cir. 2022) (age-based insults for nearly a year, vulgar graffiti, and interference with employee's workspace that had physical effects on employee sufficed under ADEA). The threshold is extremely high, because "employees are generally expected to remain employed while seeking redress." *Wince*, 66 F.4th at 1043; *see also Beverly*, 107 F.4th at 745.

Before reaching the merits, Bremen argues that Ms. Lattimore tries to introduce inadmissible hearsay to support her claim. Unless a statement can be rendered admissible, a party "may not rely upon inadmissible hearsay to oppose a motion for summary judgment." *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009); *see also* Fed. R. Civ. P. 56(c)(2), (c)(4); *Bombard v. Fort Wayne Newspapers*, 92 F.3d 560, 562 (7th Cir. 1996). Hearsay is a "statement that: (1) the declarant

8

does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801(c). Ms. Lattimore testified that when she first started working at Bremen, a CNA coworker named Deanna (whose last name she doesn't know), told her that she knew Bremen "harassed Black people and forced them to leave," and suggested she "watch [her] back" [44-3 Tr. 71-72]. Ms. Lattimore adds that Deanna told her that one of the nurses had "never treated any of the white girls like that" [*id.* Tr. 72]. This unidentified Deanna has not sworn to any such statements; Ms. Lattimore relies on these statements for their truth; yet she identifies no basis to classify them as admissible. Nor does she offer other evidence to this effect. Ms. Lattimore cannot use this inadmissible hearsay to defeat summary judgment. *See Gunville*, 583 F.3d at 985.

Ms. Lattimore's brief merely asserts that she was constructively discharged without citation to the record, so the court is left to examine her independent and fairly short statement of material facts to see whether she presents such a genuine triable issue. First, she says a white nurse, Staci, once called her too many times while she was on a break [44-3 Tr. 87-88]. Without providing any specific information or comparators, Ms. Lattimore alleges that the white CNAs weren't treated the same way when they took smoke breaks [*id.* Tr. 87-89]. When pressed, she testified that she "asked a couple of the girls, like, has she ever called and interrupted their breaks? And they told me, no. And that was all white girls that I talked to" [*id.* Tr. 91]. This happened to Ms. Lattimore once, and she offers only speculation that it was related to her race. Courts "deal in proof" and can't rely on leaps to defeat summary judgment. *Flowers v. Kia Motors Fin.,* 105 F.4th 939, 947 (7th Cir. 2024). After this incident, Ms. Lattimore reported Staci to the unit manager and director of nursing, and she never worked with Staci again [44-3 Tr. 90, 92].

Ms. Lattimore also claims, though not in a sworn affidavit or deposition, that she "was pelted with racist language directed at her by a white nurse" [47-1 ¶ 10]. She cites three instances. First, she says a nurse named Jennifer made a comment in September that offended her [44-3 Tr. 133].[3] Ms. Lattimore testified that when she was walking up to the nurse's station, Jennifer said, "[H]ere they come. Now they're going to be everywhere like the Amish people" [*id.*]. Ms. Lattimore said that when she told Unit Manager Kroft, she was told to "develop tougher skin" [*id.* Tr. 134]. Ms. Lattimore speculates that Jennifer was referring to Black people [*id.* Tr. 138]. Taking all reasonable inferences in Ms. Lattimore's favor, perhaps she was, but the comment didn't significantly disrupt her work. Instead, Ms. Lattimore testified that "that was the only comment she made," and thereafter Ms. Lattimore "just ignored it" and befriended Jennifer [*id.* Tr. 134].

The next two instances happened with a nurse named Kurta in November. Kurta asked Ms. Lattimore why her hair was "nappy," and when Ms. Lattimore reported the comment to her supervisors, she once more was told to "develop tougher skin" [*id.* Tr. 137]. She adds that, in the same interaction, Kurta said she didn't know why Bremen kept hiring "you people" when complaining about Ms. Lattimore's inability to do her work [*id.* Tr. 136]. When pressed about whether Kurta's comments were about race or people who weren't certified to provide insulin, Ms. Lattimore said she just knew it was about race because "when some white people refer to a class, just a class of people, they refer to them as you people without saying Black or Mexican or Caucasian" [*id.* Tr. 138]. She then conceded that she didn't know if it was about "QMAs who are not required or not licensed to give insulin" or race [*id.* Tr. 139]. She says after each dispute, her

---

[3] Ms. Lattimore doesn't know Jennifer's last name [44-3 Tr. 134].

10

managers counseled her, and she never saw her white coworkers being counseled about their behavior towards her [*id.* Tr. 45].[4]

Ms. Lattimore hasn't provided grounds for a reasonable jury to conclude that her work environment was "permeated with discriminatory intimidation, ridicule, and insult." *Brooks*, 39 F.4th at 441. Even if inappropriate, even in the collective, these instances don't exceed the "sporadic use of abusive language." *Ford v. Minteq Shapes and Servs.*, 587 F.3d 845, 848 (7th Cir. 2009) (citing *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct" that creates a hostile work environment, much less grounds for constructive discharge. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840-41 (7th Cir. 2009). She cannot establish for a reasonable jury a hostile work environment (one severe and pervasive) or an adverse action by way of constructive discharge.

Ms. Lattimore cites four isolated incidents. None of these recurred. *See Ford*, 587 F.3d at 848 (racial comments that were "rude and offensive" weren't sufficient to establish hostile work environment because they happened only once). None interfered with her job performance. In fact, she testified that she ignored one and befriended the speaker. Only one, Kurta's comment about her hair, carried explicit racial overtones. *See Paschall v. Tube Processing Corp.*, 28 F.4th 805, 815 (7th Cir. 2022) (one time use of racial epithet not severe enough to trigger hostile working environment liability). Ms. Lattimore conceded she couldn't be sure the others related to race [44-3 Tr. 139]. *See Trahanas v. Northwestern Univ.*, 64 F.4th 842, 855 (7th Cir. 2023) (no Title VII liability when comments weren't based on race, color, religion, sex, or national origin).

---

[4] Ms. Lattimore makes this claim, but she provides no similarly situated comparators for the court to assess. *See Reinebold v. Bruce*, 18 F.4th 922, 925 (7th Cir. 2021) ("To show [s]he was intentionally treated less favorably than others similarly situated, [the plaintiff] must introduce evidence of similarly situated comparators.").

The court examines the record holistically too, taking into account all inferences in Ms. Lattimore's favor, but she hasn't shown a jury could conclude that a reasonable person in her position would have felt compelled to resign because the circumstances had become so intolerable. *Beverly*, 107 F.4th at 745. She offers isolated examples of failures to get along with her coworkers, stray comments, and often speculation that the poor treatment happened because of her race. *See Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 806 (7th Cir. 2014) ("inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion"). Ms. Lattimore's experience may have been unpleasant at moments, but no reasonable jury could conclude that the comments and events on this record created conditions so intolerable that an ordinary person would be forced to resign. Without an adverse action, Ms. Lattimore's claims fail. *Oliver,* 893 F.3d at 411-12.

One final note must be made, for Ms. Lattimore alleges that her supervisor physically attacked her the last day of work. A threat to physical safety often has appeared in constructive discharge cases. But all Ms. Lattimore cites is a police report, and that report never mentions an attack or physical altercation, much less one during her employ [47-3]. Instead, it documents that Ms. Lattimore reported a theft of a check on December 23, 2022—three days after she left work. It offers nothing material to oppose summary judgment.

Construing all facts and reasonable inferences in favor of Ms. Lattimore, a reasonable jury could not find for her on her Title VII or § 1981 claims, so the court must enter summary judgment for Bremen. The court need not address other arguments for the same relief.

CONCLUSION

Accordingly, the court GRANTS the summary judgment motion [42], DIRECTS entry of judgment for LP Bremen Management LLC, and VACATES the trial date of September 30, 2025 and the final pretrial conference date of September 15, 2025. This order terminates the case.

SO ORDERED.

June 26, 2025                               *s/ Damon R. Leichty*
                                            Judge, United States District Court